## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel*. **JAMES P. CONNORS,** <br><br> **Plaintiff,** <br><br> **-against-** <br><br> **BTG INTERNATIONAL LIMITED** <br><br> **-and-** <br><br> **BIOCOMPATIBLES, INC.** <br><br> **Defendants.** | **Civil Action No.:** |

## COMPLAINT

Plaintiff United States of America *ex rel*. James P. Connors complains as follows:

### Preliminary Statement

1.   This is a civil action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. *Qui tam* Relator James P. Connors acting on behalf of the United States, brings this action under 31 U.S.C. § 3730(b)(1) seeking recovery of treble damages for harm to the United States by defendant Unisys, Inc. for defrauding the United States in an amount of at least $12 to 13 million.

2.   Relator James P. Connors, MD a professor of radiology and practicing radiologist, has investigated and determined that BTG has violated the False Claims Act in that (1) BTG has deliberately promoted off-label "chemoemblization" use for LC Bead (2) BTG has instructed physicians on how to code for off-label LC Bead use for Medicare and Medicaid reimbursement,

and (3) based on BTG's annual reports, BTG has earned tens of millions per year in sales for off-label LC Bead use wrongfully reimbursed by Medicare and Medicaid.

**Jurisdiction and Venue**

3. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331,1345, and 31 U.S.C. § 3730(e)(4), and under 31 U.S.C. § 3732(a). The action arises under 31 U.S.C. §§ 3729 & 3730, and Relator brings suit on behalf of the United States under 31 U.S.C. § 3730(b)(1).

4. The Court has personal jurisdiction over the defendant under 31 U.S.C. § 3732(a) because the defendants can be found in, and transacts business in, this district, and because 31 U.S.C. § 3732(a) authorizes nationwide service of process.

5. Venue is proper in this district under 31 U.S.C. § 3732(a) because the defendants can be found in, and transacts business in, this district. In addition, acts proscribed by the False Claims Act occurred in this district.

6. Concurrently with the filing of this original complaint, and as required by 31 U.S.C. § 3730(b)(2), Relator served the United States with a copy of the complaint and a written confidential and privileged statement of all known material evidence and information related to the complaint.

**Parties**

7. Relator James P. Connors, MD, is a practicing radiologist and an Assistant Professor of Radiology.  Dr. Connors received his doctorate of medicine at the University of Illinois College of Medicine.  He was a resident of diagnostic radiology at the University of Missouri Health Services Center where is now an assistant professor of radiology and a part-time member of the clinical faculty.  He has also practiced as a radiologist at Harry S. Truman Memorial

Veterans Hospital in Columbia, MO.  Dr. Connors is a member of the Radiological Society of North American, the American College of Radiology, is board certified in Diagnostic Radiology by the American Board of Radiology, and is licensed to practice medicine in MO.

8.   Defendant BTG International Limited ("BTG") is a UK-based global medical device company with a market capitalization of £2.14 billion or $3.57 billion.  BTG sells interventional radiology medical devices, including relevant to this case Bead Block® and LC Bead™, which are used by physicians to embolize tumors such as liver cancer, hepatocellular carcinoma, or metastatic colorectal cancer.

9.   Defendant Biocompatibles, Inc. ("Biocompatibles"), a subsidiary of BTG, is a US distributor of pharmaceutical devices headquartered in Oxford, CT.

## General Allegations

### I.   Illness and Treatment

10. Liver cancer is one of the most dangerous and life-threatening cancers because cell growth in the liver is much more accelerated than in other parts of the body.

11. The primary medical treatment for liver cancer is to "embolize" the cancerous cells, which is also known as "embolization."  There are three embolization therapies, (1) "arterial embolization" or "bland embolization" (small particles injected to plug up artery and block blood supply to the tumor), (2) radioembolization" (injects small radioactive particles into the hepatic artery which give off small amounts of radiation to the tumor site for several days), and (3) "chemoembolization" (tiny beads next to the tumor give off chemotherapy or injected directly into the tumor by a catheter).

12. The medical device at issue in this action is LC Bead, which provides a chemoembolization therapy.

13. As described below, there is no reliable scientific evidence that chemoembolization is a more effective therapy than much cheaper (and therefore less profitable) bland embolization. Worse, there is persuasive clinical evidence, including a recent study, concluding that chemoembolization therapy does not provide patients any additional benefit *in extending life* than bland embolization therapy.

## II.  FDA Regulatory Requirements

14. A medical device is defined in the Food, Drug, and Cosmetic Act as a treatment, diagnostic, or aid that does not involve drug interaction.

15. The Food and Drug Administration ("FDA") approves a medical device manufacturer's product labeling—which permits its marketing and sales—according to two regulatory pathways.

16. The first and by far the most common is the "510(k)" process (named after the CFR section that describes the process), where a new medical device that can be demonstrated to be "substantially equivalent" to a previously legally marketed device can be "cleared" by the FDA for marketing.  The 510(k) pathway rarely requires clinical trials.

17. The second is the "Premarket Approval" process or "PMA," where there are no other comparable medical devices on the market and where clinical trials are almost always required for FDA approval.

## III.  BTG's Entry into the US Medical Device Market

18. At some point prior to December of 2008, BTG, through its subsidiary Biocompatibles, submitted to the FDA a 510(k) premarket notification of intent to market for Bead Block and LC Bead for the same indication, namely for bland embolization only, i.e., to block cardiovascular pathways to the cancerous tumors.

4

19. Biocompatibles' 510(k) submissions stated that the "intended use" for LC Bead and Bead Block compared to the devices already approved for bland embolization were "the same" and, further, that there were "no differences" between LC Bead and Bead Block (Bead Block cannot chemoembolize a tumor, only bland embolize it).

20. Through these submissions and the FDA's later approval in 2008, *BTG unequivocally represented to the FDA that it would only sell LC Bead for bland embolization*.

21. Biocompatibles' 510(k) premarket notification of intent for Bead Block for bland embolization made sense in that Bead Block is only sold and used for bland embolization, but for LC Bead did not make sense because LC Bead has never been used for anything other than chemoembolization; it is much too expensive to use for bland embolization and is never sold that way.

22. Because there has never been any FDA approved chemoembolization medical device in the US market, Biocompatibles should have sought PMA approval for LC Bead chemoembolization. Indeed, BTG had done so in Europe for DC Bead, a medical device indistinguishable from LC Bead.

23. But BTG and Biocompatibles have never applied for PMA approval. As discussed below, BTG and Biocompatibles likely did not file for PMA because it knew that its PMA would be rejected due to the lack of credible scientific evidence, i.e., "Level 1" studies. Indeed, there are no clinical studies showing any statistical benefit in survival rates in chemoembolization over bland embolization.

24. According to its 2013 Annual Report, BTG now sells LC Bead through 20 account managers ("sales reps") supported by 12 medical science liaisons ("MSLs") who provide medical advice on how LC Bead is applied.

IV. **False Claims Violation**

    A. **Fraudulent Course of Conduct**

25. Through discussions with his colleagues and through his own investigation, Dr. Connors has concluded that BTG and Biocompatibles have violated the FCA as set forth below.

26. BTG knowingly promotes off-label LC Bead use as follows:

27. Despite its approval for bland embolization only, BTG and Biocompatibles *never promotes, markets, or sells* LC Bead for *anything other* than off-label chemoembolization.  This means that BTG's simple act of selling LC Bead in the United States by any method is necessarily off-label promotion.

28. As described below, BTG, through its sales reps and the Biocompatible website, instructs physicians on *how to code* for Medicare reimbursement for off-label LC Bead use through the help of an outside vendor, The Pinnacle Group.

29. This instruction is obviously intended to encourage physicians to purchase LC Bead for off-label use—otherwise, why would BTG provide such an instruction through a paid outside vendor like The Pinnacle Group

    B. *Scienter*.

30. BTG has knowingly promoted and sold LC Bead for off-label bland embolization with *scienter* as follows:

31. *A more profitable device*.  BTG knowingly sells LC bead for FDA unapproved chemoembolization and not FDA approved bland embolization because it is more profitable to do so.  Each vial of LC Bead sells for between $2,000 and $2,800, depending on the volume of vials purchased by the physician or medical group.

32. The sales reps encourage the radiologist to purchase two per procedure, which is approximately $4000 to $5600. By contrast, each Bead Block sells for only $200 per bead. Usually one or two Bead Block applications are sufficient to treat the tumor. Selling LC Bead is simply much more lucrative than selling Bead Block.

33. *No competition in the market*. BTG also wanted to sell LC Bead for chemoembolization because there is no domestic competitor—likely because there is no Level 1 clinical evidence that chemoembolization provides any benefit in lengthening patient survival rates more than bland embolization. A brief review of the scientific literature bears this out:

34. BTG has used two studies from 2002 to show that chemoembolization is superior to bland embolization. However, those studies are not Level 1 because they were (1) not statistically significant after they were stopped when one group was shown to be surviving at a higher rate and (2) not statistically significant because the samples were too small.

35. Published in June of 2009, BTG paid for and calls its "landmark study" by Lammers et al., (the "Lammer study"), was a Level 1 clinical comparison of chemoembolization and bland embolization. It *did not* conclude that chemoembolization was any more effective than bland embolization.

36. Published in June of 2011, the Lewandowski et al. study is promoted by BTG as a "landmark" Level 1 study (which BTG paid for) but which is inconclusive in its review of studies that examine the survival benefits of chemoembolization.

37. Another study also published 2011 (Shah et al.) concludes the same thing, that there is no statistical benefit to chemoembolization compared to bland embolization, and further criticizes the two 2002 studies as not showing any "statistically significant distinction" between chemoembolization and bland embolization.

7

38. Published in 2013, the Blue Cross Blue Shield Medical Policy describes chemoembolization for liver tumors as not yet proven to be medically necessary: "Randomized studies are currently underway to determine the additional value of this technique over other established methods[.]"

39. This year, a Level 1 study reported by Karen Brown, MD, a prominent cancer researcher and clinician at Sloan-Kettering Cancer Center, has concluded that chemoembolization does not provide any statistically significant survival benefit compared to bland embolization.

40. Dr. Brown also criticized the 2002 studies as not proving any statistical benefit based on how they were conducted and on the insufficient sample size (as she says the authors of the studies themselves admitted).

41. In sum, BTG deliberately avoided submitting a PMA to the FDA for LC Bead chemoembolization because BTG, like its competitors, recognized the reality that there was and is *no* Class 1 clinical evidence that chemoembolization provided any statistical benefit over bland embolization in extending patient survival, and thus, BTG knew that the FDA would reject its PMA.

42. *"Decoy" FDA approval.*  BTG knowingly sold LC Bead off-label based on its FDA approval strategy, which is known as "decoy" approval.

43. The FDA permits physicians to use medical devices "off-label": "Once a drug or medical device has been approved or cleared by FDA, generally, healthcare professionals may lawfully use or prescribe that product for uses or treatment regimens that are not included in the product's approved labeling (or, in the case of a medical device cleared under the 510(k) process, in the product's statement of intended uses)."

44. Playing on this loophole in the labeling requirements, BTG, through Biocompatibles, submitted LC Bead for 510(k) approval for an indication for which it is not sold or used, i.e., bland embolization, but for which it knew it could get an easy FDA approval.

45. By getting approval for an indication for use, BTG had the "cover" to promote, market, and sell LC Bead for off-label use under the fiction that it was physicians (and not BTG) who were causing LC Bead to be sold and used off-label.  BTG had the ready-made chemoembolization marketing literature from DC Bead in Europe to present to the customer "upon request."

46. *Concealing chemoembolization from marketing literature*.  BTG's case studies of physicians using LC Bead, which are used by sales reps as marketing literature for new physician or hospital customers *conceals* any chemoembolization, even though it is the only therapy performed in those case studies.

47. This means that BTG is aware that its off-label promotion of LC Bead is illegal; otherwise it would not need to conceal anything.

**C.     That was material and that caused the government to pay out money.**

**(1)     Medicare Coding**

48. BTG's "decoy" scheme selling LC Bead for an indication not approved would not have been successful had physicians not been able to reimburse their LC Bead purchases by successful Medicare and Medicaid coding.

49. To that end, BTG, through Biocompatibles, provides advice and direction to physicians in how to properly code LC Bead for Medicare and Medicaid reimbursement through its consulting arrangement with The Pinnacle Group, a company based in Pennsylvania which,

among other things, provides "tactical implementation of reimbursement plans that including

coding, coverage, and payment…for medical devices[.]"

50. In particular, BTG's sales reps and MSLs directs physicians to The Pinnacle Group's

1-800 number or website.  BTG's Biocompatibles' website also advises physicians that

reimbursement instructions are available at the Pinnacle Group as follows:





| Product Number | Name | Description | Unit |
|---|---|---|---|
| VE020GS | LC Bead*M1*™ embolization product | Black & Yellow Label Color, Size 70-150µm, Volume 2ml beads | 1 vial |
| VE220GS | LC Bead™ embolization product | Yellow Label Color, Size 100-300µm, Volume 2ml beads | 1 vial |
| VE420GS | LC Bead™ embolization product | Blue Label Color, Size 300-500µm, Volume 2ml beads | 1 vial |
| VE620GS | LC Bead™ embolization product | Red Label Color, Size 500-700µm, Volume 2ml beads | 1 vial |

For more information or to order, please contact:

| | | |
|---|---|---|
| Customer Service | Toll Free Phone: | 877.626.9989 |
| Biocompatibles, Inc. | Toll Free Fax: | 877.626.9910 |
| 115 Hurley Road | Phone: | 203.262.4198 |
| Building 3 | Fax: | 203.262.6314 |
| Oxford CT 06478 | Email: orders@biocompatibles.com | |
| USA | www.biocompatibles.com | |

Reimbursement Service:
The Pinnacle Health Group
Phone:    866-369-9290 or 215-369-9290
Fax:       877-499-2986 or 215-369-9198
Email:    LCBead@thepinnaclehealthgroup.com
            BeadBlock@thepinnaclehealthgroup.com

51. The physician who calls Biocompatibles or The Pinnacle Group for reimbursement

information is directed to www.thepinnaclehealthgroup.com, and to login: "BTG" and password:

"LCBead".  Upon visiting the Pinnacle Group website and entering the login and password, the

physician sees a webpage called "LC BEAD 2013 Reimbursement Coding Reference," which

provides the Medicare code for LC Bead chemoembolization under code 37204:

## LC Bead™
### 2013 Reimbursement Coding Reference

| CPT-4® | Description | Status Indicator | APC | Medicare** |
|---|---|---|---|---|
| 37204 | Transcatheter occlusion or embolization (eg, tumor destruction, achieve hemostasis, occlude a vascular malformation), percutaneous, any method, non-central nervous system, non-head/neck | T | 0082 | $7671.18 |

52. BTG's instruction to purchasing physicians to reimburse LC Bead procedures for Medicare and Medicaid have been successful as follows:

53. Since 2008, JD Meler, MD, Baylor Director of Interventional Oncology Baylor University Medical Center has performed over 1000 LC Bead chemoembolization procedures, and has reimbursed a number of those procedures with Medicare and Medicaid.

54. Sam McCabe, MD, assistant professor of radiology, New York Medical College, has performed dozens of chemoembolization procedures with LC Bead at Westchester Medical Center, and has reimbursed a number of those procedures with Medicare and Medicaid.

55. Maureen Kohi, MD, assistant professor of clinical radiology, University of California, has performed dozens of chemoembolization procedures with LC Bead at Westchester Medical Center at the UCSF Medical Center, San Francisco, CA, and has reimbursed a number of those procedures with Medicare and Medicaid.

56. Shams Iqbal, MD, assistant professor of radiology, Tufts University School of Medicine, has performed dozens of chemoembolization procedures with LC Bead at Westchester Medical Center at the Lahey Hospital and Medical Center, Burlington, MA, and has reimbursed a number of those procedures with Medicare and Medicaid.

57. John A. Hancock MD and Ashley Roark, MD, have performed dozens of chemoembolization procedures with LC Bead at Westchester Medical Center, including a seventy-five year-old woman at the Ben Taub General Hospital, Texas Medical Center, Houston,

TX and have reimbursed a number of those procedures, including the seventy-five year-old woman (Medicare), with Medicare and Medicaid.

58. Sabah D. Butty, MD and Louis Thomas Moore, MD, have performed dozens of chemoembolization procedures with LC Bead at Indiana Hospital, and have reimbursed a number of those procedures with Medicare and Medicaid.

### (2) Damages

59. As a general rule, "the measure of the government's damages would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful."  In this case, damages are what BTG earned from physicians for selling LC Bead which are *reimbursed* by Medicare and Medicaid.

60. Based on the age group of the patients who were treated with LC Bead, we can estimate that physicians were reimbursed for about 55% of their expenditures by Medicare. Patients are Medicare eligible at 65 years of age.

61. National Cancer Institute states that 52.3% of new liver cancer patients 65 years of age or older, and 21.5% are between the ages of 55-64.  Since the mean survival rate for that 21.5% is less than 10%, the total number of Medicare eligible patients is probably closer to 55% of all patients.  This estimate is supported by the Lammers study (the mean age for the randomized controlled study was 67.3 plus or minus 9.1 years) and the U.S. Department of Health and Human Services (the median age for liver cancer is 64 years of age and the highest incidence rate was among persons 70-79 years of age).

62. BTG's US revenue from LC Bead 2013 sales can be estimated by its 2013 Annual Report at $22.5 million.

63. The 2013 Annual Report states that the company's revenues from interventional products sold have increased from £28.7 million to £28.8 million ($48.01 million to $60.39 million) from 2012 to 2013—less 25% for Brachytherapy, which only leaves the Bead products. BTG's profits from interventional medicine devices were £6.8 million ($11.38 million) in 2012 and £13 million ($21.75 million) in 2013.

64. BTG states that profits from the US have contributed to 91% growth from 2012 to 2013. Since the growth from those two years was $10.37 million, the US contribution was $9.44 million, which is almost one-half of overall sales (one-half of $21.75 million).

65. This means that in 2013, US sales were at least half of $45.29 million or approximately $22.5 million.

66. While we must assume that BTG has earned revenue from LC Bead since its "decoy" approval in 2008, we can safely conclude that damages for 2013 are around $12 or $13 million (55% of $22 million) in unlawful Medicare reimbursement, and a lesser amount each year going back to 2008 sales are reimbursed by Medicare, and an unknown reimbursement in Medicaid.

**V. Connors' Allegations Not Publically Disclosed**

67. There has never been a public disclosure of Dr. Connors' allegations herein this complaint.

68. Assuming his allegations have been made public, Dr. Connors is the original source of them.

**Count I**
**False Claims Act**
**(Fraudulent Invoicing)**

69.  The allegations of ¶¶ 1–68, above, are incorporated here by reference.

70. By the conduct described in this complaint, defendants BTG and Biocompatibles, by marketing and inducing physicians to purchase LC Bead for off-label unapproved uses, and by facilitating Medicare and Medicaid reimbursement for those purchasers as described herein, knowingly engaged in a fraudulent course of conduct with *scienter* that caused the United States to pay Medicare and Medicaid in violation of 31 U.S.C. § 3729(a)(1).

WHEREFORE, Relator James P. Connors, on behalf of the United States of America, demands judgment against defendants BTG and Biocompatibles as follows:

a.  Damages in the amount of three times the amount of the loss sustained by the United States of America on account of the defendant's violation of the False Claims Act, $36 to $39 million.

b.  Civil penalties pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000 for twenty-eight invoices which overcharged the United States.

c.  Prejudgment interest.

d.  Costs including reasonable attorney's fees.

e.  Relator James P. Connors further prays, on his own behalf, that he be awarded a portion of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his costs, including reasonable attorney's fees.

f.  Relator James P. Connors, on behalf of the United States of American and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

Relator James P. Connors, on behalf of the United States of American and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

Respectfully submitted,

 /s/ Max Maccoby
Max Maccoby (D.C. Bar No. 462064)
Butzel Long, P.C.
1747 Pennsylvania Ave., N.W., 3rd Floor
Washington, D.C. 20006
Phone: (202) 454-2800
maccoby@butzel.com
*Counsel for Plaintiff/Relator*

**Jury Demand**

Plaintiff/Relator James P. Connors demands trial by jury of all issues so triable as of

right.